**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 22, 2025**

# In the Court of Appeals of Georgia

A25A1296. YOUNG HARRIS COLLEGE v. PEACH BELT
ATHLETIC CONFERENCE, INC.

PADGETT, Judge.

This contract dispute concerns whether an exit fee imposed by a college athletic conference is a valid liquidated damages clause, or whether that fee is an improper penalty. On appeal, Young Harris College ("Young Harris") argues that the trial court erred in granting Peach Belt Athletic Conference, Inc.'s ("PBAC") motion for summary judgment and in denying Young Harris's cross-motion for summary judgment, declaring that the exit fee provision of PBAC's Constitution was valid and binding, and ordering Young Harris to pay PBAC $240,000 plus interest. We find no error and affirm.

"Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Certain Underwriters at Lloyds, London v. SRNG LLC,* 374 Ga. App. 340, 340 (912 SE2d 714) (2025) (citation and punctuation omitted). "Furthermore, if summary judgment is granted, it enjoys no presumption of correctness on appeal, and an appellate court must satisfy itself that the requirements of OCGA § 9-11-56 (c) have been met." Id. (citation and punctuation omitted). "In conducting this de novo review, we are charged with viewing the evidence, and all reasonable conclusions and inferences drawn from the evidence in the light most favorable to the nonmovant." Id. (citation and punctuation omitted).

1. Facts

(a) PBAC and how it derives revenue

So viewed, the record shows that PBAC is a men's and women's college athletic conference affiliated with the National Collegiate Athletic Association ("NCAA"). PBAC's members compete in athletic, academic, and co-curricular events in Division II of the NCAA. PBAC is governed in part by PBAC's Constitution

2

and bylaws. In January 2012, Young Harris accepted PBAC's invitation to join the conference. In connection with joining PBAC, Young Harris "accept[ed] without reservation or exception, each article contained in the [PBAC] Constitution and Bylaws as well as all rules, executive regulations, policies and procedures as published in the conference sport codes and other conference documents." Young Harris also agreed that it would "adhere to any and all terms and conditions now or in the future adopted by [PBAC]." PBAC's Constitution requires that new members pay an initiation fee when joining the conference. The new member initiation fee has been $120,000 since July 2012.

PBAC derives revenue primarily from the following sources: (1) dues paid by member schools; (2) NCAA distributions, including conference grants based on the number of schools in the conference and enhancements based on the number of championships sponsored by the conference; (3) conference championship revenue, including ticket sales and merchandise sales; (4) corporate partnership and advertising revenues; and (5) rights to broadcasting events.

(b) Withdrawal of four member schools from PBAC

Between 2016 and 2020, the following four members withdrew from PBAC: The University of Montevallo ("UM"), The University of North Carolina at Pembroke ("UNCP"), Francis Marion University ("FMU"), and Armstrong State University ("ASU"). At the time those four schools withdrew from PBAC, its Constitution provided as follows:

*Section F. Withdrawal*

1. A member desiring to withdraw from the conference shall submit written notice of withdrawal to the Conference Commissioner. The letter of withdrawal shall be received at least two (2) calendar years in advance of the effective date.

. . .

6. A withdrawing member that provides one year notice must pay a penalty equal to the annual dues amount at the time of withdrawal times two (x2). A withdrawing member that provides no notice must pay a penalty equal to the annual dues amount at the time of withdrawal times four (x4) to reimburse the conference and its member institutions for the anticipated costs and expenses incurred by reason of such withdrawal.

On June 9, 2016, UM informed PBAC of its decision to withdraw, effective June 30, 2017. Because UM provided less than two years' notice, PBAC imposed a withdrawal fee in the amount of $47,000, which was twice the annual dues of $23,500.

In June 2017, ASU merged with Georgia Southern University and terminated ASU's athletic programs. Later that month, David Brunk, Commissioner of PBAC ("Commissioner Brunk"), sent an email to ASU's president, seeking to impose a withdrawal fee in the amount of $94,000, four times the annual dues, because ASU left without at least one year's notice. ASU's counsel responded to PBAC, stating that ASU was not withdrawing from PBAC, but instead would no longer exist as an independent institution. In March 2018, PBAC and ASU settled claims relating to the exit for $52,000.

In April 2020, FMU and UNCP each, separately, notified PBAC that they would withdraw from the conference effective June 2021. Because FMU and UNCP each provided less than two years' notice, PBAC invoiced each of them for $52,000, twice the amount of annual dues, which at the time were $26,000. Both schools paid the $52,000 exit fees.

(c) July 8, 2020 Amendment to PBAC's Constitution

In May or June 2020, PBAC's Executive Committee began discussing how to estimate damages and costs that PBAC would incur if a member left the conference. These discussions included dues, the potential loss of NCAA enhancement money,

and grant money. On July 1, 2020, PBAC's Executive Committee held a meeting by video conference to discuss potential amendments to PBAC's Constitution. Commissioner Brunk prepared an agenda that was circulated to the Executive Committee in advance of the meeting. The agenda included a document titled "Review of Withdrawal Policy and Exit Fees" (the "Review"). The Review, which was prepared by PBAC Deputy Commissioner Diana Kling ("Deputy Commissioner Kling"), stated:

> Purpose:
>
> The [PBAC] document on membership has not undergone an overall review in several years. With the current rumblings of Division I conferences looking to expand as well as the departure of two current member institutions, it seems an appropriate time to review the current withdrawal policies and exit fees.

The Review classified the then-current exit fees as "penalties" that a withdrawing member had to pay:

> Currently, a withdrawing member that provides one year notice must pay a penalty equal to the annual dues amount at the time of notification of withdrawal times two (x 2). A withdrawing member that provides no notice must pay a penalty equal to the annual dues amount at the time of

notification of withdrawal times four (x 4). If a withdrawing member provides at least two years notice, there is no fee due to the conference.

The Review also included the following recommendations:

1. The constitution should be amended to include a review of membership withdrawal policies every three years to ensure sound practices are being followed as well as clarified that once a member submits official notification of withdrawal, they can no longer attend conference meetings.

AND

2. Any member withdrawing from the conference shall be assessed a flat fee equal to that of the new member initiation fee (currently $120,000)[.]

OR

3. If a member withdraws with no notice, the fee shall be six (6) times the annual dues at the time of notification of withdrawal; if a member withdraws with one year notice, the fee shall be four (4) times the annual dues at the time of notification of withdrawal; and if a member withdraws with two or more years notice, the fee shall be two (2) times the annual dues at the time of notification of withdrawal[.]

AND

4. If a member's departure causes the conference to lose a championship/s, an additional penalty in the amount of the NCAA per championship distribution will also be assessed per championship lost (currently approximately $15,000)[.]

AND

7

5. Payment of all exit fees shall be due within thirty days of formal notice to withdraw[.]

At the July 1, 2020 meeting, PBAC's Executive Committee engaged in a financial analysis to determine the cost to PBAC each time a member school withdrew from the conference, looking at the loss of dues, NCAA revenue, and championship revenue, and assessing the cost of "cultivat[ing] and solicit[ing]" new member institutions. At that meeting, the Executive Committee recommended that the exit fee be increased to reflect the costs and expenses associated with the departure of a member school. Although the damages associated with the withdrawal of a member school could not be precisely estimated, PBAC's Executive Committee determined that the anticipated loss from the departure of a member school approximated PBAC's new member initiation fee and may have exceeded that amount. The Executive Committee recommended that any member withdrawing from the conference on at least two years' notice be assessed a flat exit fee equal to the new member initiation fee, and that any member withdrawing on less than two years' notice be assessed an exit fee equal to twice the new member initiation fee. Commissioner Brunk testified in his deposition

that disincentivizing schools from leaving PBAC was not a reason why PBAC increased the exit fee.

On July 8, 2020, PBAC's Board conducted a meeting via Zoom. Young Harris was represented at the meeting by its President. At the meeting, the Board approved an amendment to the Constitution that increased the amount of the withdrawal fee for exiting PBAC members (the "July 8, 2020 Amendment"). That amendment states:

Section F: Withdrawal

. . .

5. Any member withdrawing from the conference shall be assessed a flat exit fee equal to that of the new member initiation fee when at least two year's notice is given; if less than two year's notice is given, twice the initiation fee shall apply. The exit fee serves to reimburse the Conference and its member institutions for the anticipated costs and expenses incurred by reason of such withdrawal.

Although PBAC had ten Board members at the time, one member, Flagler College, joined the meeting late and was not present for the vote on the exit fee increase. The minutes of the July 8, 2020 PBAC Board of Directors meeting reflect that "IT WAS VOTED 9-0 that any member withdrawing from the conference shall be assessed a flat

exit fee equal to that of the new member initiation fee (currently $120,000) when at least two year's notice is given; if less than two year's notice is given, twice the initiation fee shall apply."

(d) Young Harris's withdrawal from PBAC

On November 10, 2022, more than two years after the adoption of the July 8, 2020 Amendment, Young Harris sent a letter to PBAC notifying the conference of its intent to withdraw from PBAC effective June 20, 2023. The letter stated that "Young Harris will follow the example of [FMU] and [UNCP] and pay an exit fee of $52,000 by June 30, 2023. That same day, PBAC responded, stating that under the July 8, 2020 Amendment, Young Harris was required to pay $240,000 as an exit fee because it provided less than two years notice of its intent to leave. The parties exchanged additional correspondence but did not resolve this matter.

2. Procedural history

In January 2023, PBAC sued Young Harris, seeking a declaratory judgment that the exit fee provision of the July 8, 2020 Amendment was valid and binding and that Young Harris was liable to PBAC for exit fees in the amount of $240,000 and asserting claims for breach of contract based on Young Harris's failure to pay the $240,000 exit

fee and for attorney fees under OCGA § 13-6-11. Young Harris asserted counterclaims for breach of contract, declaratory judgment, and attorney fees under OCGA § 13-6-11.

PBAC filed a motion for summary judgment, and Young Harris filed a cross-motion for summary judgment. After a hearing on the motions, the trial court entered an order granting PBAC's motion for summary judgment and denying Young Harris's cross-motion for summary judgment. In its order, the trial court found, among other things, that the exit fee in PBAC Constitution was a valid and enforceable liquidated damages provision because:

> [T]he PBAC could not accurately estimate the injury resulting from a member's withdrawal prior to withdrawal. The PBAC could not arrive at such an estimate because it could not know the impact of the withdrawal on the NCAA Strategic Priorities Funds or the NCAA Sports Sponsorship Funds it receives annually, could not know the travel costs that would be incurred in the course of replacing competitions with the withdrawing member, and could not know other potential costs.
>
> . . . . [T]he PBAC intended the fee to estimate the costs and expenses associated with the withdrawal of a member school, and did not intend it to be a penalty. The provision expressly states that it is intended to "reimburse the Conference and its member institutions for the anticipated costs and expenses incurred by reason of such withdrawal."

[ ] Neither the description of a previous exit fee provision as a penalty in prior PBAC Constitutions, nor the use of the new member initiation fee in the calculation of the exit fee, nor the fact that the July 8th, 2020 amendment significantly increased the prevailing exit fee is evidence that the July 8th, 2020 amendment imposed a penalty instead of a liquidated damages provision.

. . . . [T]he fee is a reasonable estimate of the probable loss. The estimate was based on preparation of a Review of Withdrawal Policy and Exit Fees review prepared by the PBAC Commissioner and the Executive Committee's consideration of the review, and the estimate is significantly less than the total actual and estimated losses resulting from Young Harris's withdrawal.

The trial court also found that Young Harris' failure to pay the $240,000 exit fee violated PBAC's Constitution as amended on July 8, 2020.

3. This appeal

Young Harris brought this appeal contending that the trial court erred by denying Young Harris's cross-motion for summary judgment, because the exit fee fails to satisfy Georgia's tripartite test for enforceability of liquidated damages provisions; failing to consider relevant extrinsic evidence regarding PBAC's prior classification of the exit fee provision as a "penalty," and thus PBAC's intent to penalize withdrawing

members that fail to provide the required notice; and failing to limit PBAC's potential recovery to damages actually shown because the enforcement of the liquidated damages provision is "doubtful."

(a) Whether the exit fee was an enforceable liquidated damages clause

In two related claims of error, Young Harris contends that the trial court erred in finding that the exit fee was a valid liquidated damages clause.

Under OCGA § 13-6-7, "[i]f the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby." Furthermore, "[i]n deciding whether a contract provision is enforceable as liquidated damages, three factors must exist." *J.P. Carey Enterprises., Inc. v. Cuentas, Inc.*, 361 Ga. App. 383, 388 (1) (864 SE2d 588) (2021) (citation and punctuation omitted); *Aflac, Inc. v. Williams*, 264 Ga. 351, 354 (2) (444 SE2d 314) (1994). First, "the injury must be difficult to estimate accurately." *J. P. Carey Enterprises,* 361 Ga. App. at 388 (1) (citation and punctuation omitted). Second, "the parties must intend to provide damages instead of a penalty[.]" Id. (citation and punctuation omitted). Finally, "the sum must be a reasonable estimate of the probable loss." Id. (citation and punctuation omitted). Additionally, "the party

13

who defaults on the contract has the burden of proving the liquidated damages clause is an unenforceable penalty." Id. (citation and punctuation omitted). However, "the defaulting party can carry this burden by proving any of the three factors is lacking." Id. (citation and punctuation omitted). "Ultimately, the enforceability of a liquidated-damages provision in a contract is a question of law for the court." Id. (citation and punctuation omitted). "And in cases of doubt, the courts favor the construction of a contract which holds the stipulated sum to be a penalty, and limits the recovery to the amount of damage actually shown, rather than a liquidation of the damages." Id. (cleaned up). Applying this three-part test to the exit fee, we find that the trial court did not err.

i. Whether damages were difficult to estimate

Young Harris argues that the record lacks evidence that it was difficult to estimate accurately any injury to PBAC resulting from member withdrawals. Young Harris correctly notes that the July 8, 2020 Amendment contains no language indicating that any damages accruing to PBAC upon a member withdrawal would be difficult to estimate. However, explicit language to that effect is not required. We previously have held that such language unambiguously shows that the parties agreed

that damages caused by a breach would be difficult to estimate. *Fuqua Constr. Co., Inc. v. Pillar Dev., Inc.*, 293 Ga. App. 462, 465-466 (667 SE2d 633) (2008). We have not held, though, that parties are required to include such language in order to find that damages would be difficult to estimate. Nor do we do so now.

While Young Harris contends that "information was readily available to facilitate an estimated damages amount to be inserted into the Amendment, rather than simply selecting the new member initiation fee as a liquidated sum," Young Harris has failed to point to that evidence. Instead, Young Harris contends that this information is known because the sources of PBAC's revenue are readily available. Those sources, as set forth above in Division 1 (a) are: (1) dues paid by member schools; (2) NCAA distributions, including conference grants based on the number of schools in the conference and enhancements based on the number of championships sponsored by the conference; (3) conference championship revenue, including ticket sales and merchandise sales; (4) corporate partnership and advertising revenues; and (5) rights to broadcasting events. But knowing the source of revenue is different than knowing the amount of revenue at an indeterminate, later time.

On the other hand, Commissioner Brunk's affidavit affirmatively states that because "the damages associated with the withdrawal of a member school could not be precisely estimated, the Executive Committee recommended that the conference adopt a flat exit fee reasonably approximating the anticipated losses." Commissioner Brunk also testified at deposition that when PBAC's Executive Committee began looking through the anticipated costs incurred from the withdrawal of a member school, the committee ascertained "that it [was] equally really almost – almost or maybe even a little more than what the new member initiation fee was. So in supplication, it was brought up let's go ahead and just say equal to the new member initiation fee," and that PBAC's damages could have exceeded the new member initiation fees, so the committee chose that method to simplify its calculation. Further, Commissioner Brunk testified that PBAC "in no way relied on the initiation fee to come up with those amounts." And so we do not agree with Young Harris's contention that the evidence shows that PBAC "simply elected to tie the 'exit fee' to the new member initiation fee."

For these reasons, we also disagree with Young Harris's claim that "[Commissioner Brunk] conceded that PBAC's Executive Committee had no trouble

16

in presumably estimating any alleged damage that PBAC could incur when a member withdrew." In fact, Commissioner Brunk testified:

> Q: Do you ever recall any members of the executive committee ever stating in those executive committee meetings: We cannot precisely estimate these damages? Do you ever recall anybody saying words to that effect?
>
> A: Well, I recall, you know, approximation because it would be hard, you know, here -- to put the exact. That's where we landed on the -- you know, close or over the new member entrance fee.

Young Harris also contends that PBAC Deputy Commissioner Kling testified that she had no recollection of PBAC's difficulty in estimating possible damages and confirmed that the sources of information consisting of conference revenue were accessible to the PBAC at the time they made the new fee. However, Deputy Commissioner Kling testified that certain sources could not be determined until after a member's withdrawal after the NCAA issued checks in the spring. And while Deputy Commissioner Kling testified that she did not recall any discussion at the July 8 meeting among board members about the "impossibility" to estimate financial damages from a member school leaving the conference, Commissioner Brunk testified

that the PBAC engaged in a financial analysis of these issues at the July 1 meeting after which they made recommendations that were voted on at the July 8 meeting. Notably, the evidence also shows that Deputy Commissioner Kling did not attend the July 1 meeting. It is, therefore, unsurprising that she did not recall discussion of the issue at the July 8 meeting since it took place at the July 1 meeting, which she did not attend. Accordingly, the trial court did not err in finding that the evidence showed that damages were difficult to estimate.

ii. Whether the parties intended to provide damages instead of a penalty

Young Harris contends that the amendment was intended as a penalty and is therefore unenforceable. "[W]e ascertain the intent of the parties by first looking to the language of the contract. Although the words used by the parties are not conclusive, they are a significant factor in determining the parties' intent." *City of Brookhaven v. Multiplex, LLC*, 369 Ga. App. 9, 12 (891 SE2d 60) (2023) (citation and punctuation omitted). However, "whether a provision represents liquidated damages or a penalty does not depend upon the label the parties place on the payment but rather depends on the effect it was intended to have and whether it was reasonable." Id. (citation and punctuation omitted). "[W]here a designated sum is inserted into a contract for the

purpose of deterring one or both of the parties from breaching it, it is a penalty." Id. (citation and punctuation omitted).

Citing *City of Brookhaven*, 369 Ga. App. at 12-13, Young Harris contends that the absence of language in the July 8, 2020 Amendment stating that the exit fee is not a penalty means that the trial court should have looked to parol evidence to determine the parties' intent. We disagree. In *City of Brookhaven*, we affirmed the trial court's grant of summary judgment to the defendant on the plaintiff's claim for liquidated damages. There, the relevant contract provision stated that: "[the defendant] shall have 180 days from the notice to proceed to complete the project. Failure to complete the required construction as specified will result in the assessment of Liquidated Damages at the rate of $1,000.00 per calendar day." *City of Brookhaven*, 369 Ga. App. at 10. We noted that "the Contract lacks, however, any language indicating that the liquidated damages were not intended to be a penalty." Id. at 12-13. We then held that "[a]bsent such language, the court can look to parol evidence in the record to determine the effect the provision was intended to have." Id. at 13. For that point of law, we relied on *J.P. Carey Enterprises*, where we held that "although the [contract] provisions were not characterized by the note as penalties, there is no language in the

contract showing that the parties intended these provisions to be liquidated damages rather than a penalty." *J. P. Carey Enterprises*, 361 Ga. App. at 391 (1) (b). We then looked at parol evidence to ascertain the parties' intent.

Here, the facts are different. The July 8, 2020 Amendment did not expressly state that it was not intended to serve as a penalty but that "[t]he exit fee serves to reimburse the Conference and its member institutions for the anticipated costs and expenses incurred by reason of such withdrawal." Thus, unlike *City of Brookhaven*, the July 8, 2020 Amendment did not "lack[] . . . any language indicating that the liquidated damages were not intended to be a penalty." 369 Ga. App. at 12-13. Rather, the language of the contract expressly stated that its purpose was to reimburse the PBAC and its member institutions for the anticipated costs and expenses incurred by reason a member institution's withdrawal from the conference. We disagree with Young Harris that *City of Brookhaven* requires particular language in a liquidated damages clause affirmatively stating that the provision was not intended as a penalty. Rather, we read *City of Brookhaven* more narrowly as simply setting forth what we previously have held in cases such as *J. P. Carey Enterprises*, namely, that trial courts must look to the

contract for language showing whether the parties intended the provision to be liquidated damages rather than a penalty.

Although our inquiry on this second prong of the tripartite test could stop here, we nonetheless reject Young Harris's argument that the court failed to consider relevant extrinsic evidence labeling the exit fee as a penalty. Young Harris directs us to the 2017 version of PBAC's constitution which specifically references the exit fee as a penalty, as well as other documents that refer to the 2017 fee as a penalty. Young Harris also points to the Review prepared for the July 1 Executive Committee meeting. That document referred to the withdrawal fees as "penalties," but because the PBAC did not adopt any recommendation from the Review explicitly imposing a penalty, these recommendations are not evidence that PBAC intended to impose a penalty. If anything, the recommendations are evidence that PBAC did not intend to impose a penalty since it did not adopt any recommendation explicitly imposing a penalty. Similarly, although an earlier contract labeled the exit fee as a penalty, that is not evidence that the exit fee in the newer contract was intended to be a penalty.

Additionally, Young Harris contends that the fee in the July 8, 2020 Amendment must be a penalty because it is significantly greater than the old fee. But when the July

8, 2020 Amendment was adopted, it replaced the prior exit fee that had not been updated since the 2009-2010 academic year, more than a decade prior. Thus, we are unpersuaded that an increase in the amount of a liquidated damages clause over and above the amount of a penalty set a decade earlier requires us to conclude that the fee is a penalty.[1]

iii. Whether the exit fee was a reasonable estimate of probable loss

Young Harris next argues that there is an absence of evidence in the record showing that PBAC engaged in a reasonable pre-estimation of damages. "[T]he touchstone question is whether the parties employed a reasonable method under the circumstances to arrive at a sum that reasonably approximates the probable loss." *City of Brookhaven*, 369 Ga. App. at 13 (citation and punctuation omitted)."[W]hen the amount of liquidated damages plainly has no reasonable relation to any probable actual damage which may follow a breach, the contractual provision will be construed as an unenforceable penalty." Id. (citation and punctuation omitted). The court may look

---

[1] We also disagree with Young Harris's contention that the fee increased by 361 percent from the fee prior to the adoption of the July 8, 2020 Amendment. Because Young Harris provided less than one year notice of its intent to withdraw from the PBAC, it would have owed the PBAC four times the amount of its annual dues of $26,000 under the prior fee schedule, not $52,000. That amount is $104,000, and the increase to $240,000 is an increase of approximately 130 percent.

to evidence in the record to determine whether the liquidated damage amount is a reasonable pre-estimate of the probable loss even though the contract uses the words "liquidated damages." Id. "The record must show evidence that prior to the execution of the agreement, there was an attempt to estimate damages resulting from a potential breach." Id. at 13-14 (citation and punctuation omitted).

Here, the record shows that the Executive Committee met and considered a number of different sources of revenue, as well as multiple sources of costs and expenses when attempting to estimate losses resulting from a member's withdrawal. And the Executive Committee reviewed multiple proposals for a change to the exit fee during the meeting. After its discussion, the Executive Committee determined the existing exit fee was insufficient and agreed to recommend that the Board increase the exit fee "to more fully reflect the significant costs and expenses associated with the departure of a member school." Because anticipated losses as a result of a withdrawal could not be precisely determined, the Executive Committee recommended an exit fee that it believed to reasonably approximate the anticipated losses.

And while Young Harris contends that PBAC simply used the new member initiation fee as a basis for the exit fee, Commissioner Brunk testified in his deposition

that "[i]t wasn't tied to new member dues. It was based on an assessment of the projected costs or losses . . . with a member leaving . . . And it just happened that it was the end result that it was close to what the new member initiation fee is. Again, just talk approximation."

We also reject Young Harris's contention that the record is "devoid of evidence that PBAC used *any method* (much less a 'reasonable method') when arriving at the liquidated sum contained in the [July 8, 2020] Amendment." Commissioner Brunk's deposition testimony shows the following exchange:

> Q: Prior to the adoption of this amendment to the constitution that we've been talking about that's memorialized in Section F-5, did PBAC engage in any type of financial analysis to determine with any specificity what the amount of those anticipated costs and expenses would be?
>
> A: Not in depth because some of the -- some of the revenues or expenses could not be distinctly determined. I mentioned earlier about the NCAA enhancement revenue or the NCAA grant revenue. You know, we just went by what -- you know, what those were at the time knowing that those were going to be going up then eventually, you know, in the subsequent year or years. So -- but it was, again, they're six or seven buckets. And, you know, here's what we are anticipating. So, you know, it was just a -- I hate to sound redundant, but just an approximation of what the costs incurred or revenues lost as a result.

We disagree with Young Harris's attempts to characterize this testimony as evidence that PBAC did not engage in any reasonable method to determine the costs associated with the withdrawal of its members. Rather, the testimony appears to show that PBAC did not engage in an in-depth analysis of some of the costs because they were unable to do so. This is supported by Commissioner Brunk's additional testimony at the July 1, 2020 meeting, that the Executive Committee engaged in a financial analysis to determine the cost to PBAC each time a member school withdrew from the conference, including looking at dues, NCAA revenue, championship revenue, and the cost of "cultivat[ing] and solicit[ing]" new member institutions.

iv. Admissibility of Commissioner Brunk's affidavit

Although not enumerated separately as error, Young Harris contends that the trial court erred in relying on two paragraphs of an affidavit executed by Commissioner Brunk which "contains nothing more than a self-serving, inadmissible recitation of what the Executive Committee 'considered,' 'determined,' and 'recommended' to the PBAC Board." We disagree.

Young Harris complains about the following two paragraphs of Commissioner Brunk's affidavit:

21. The departure of these two institutions prompted the PBAC to review its withdrawal policies, including the exit fee charged to withdrawing members. Following this review, the Executive Committee determined that the prevailing exit fee was insufficient to reimburse the conference for the costs and expenses associated with the withdrawal of a member school, including: (1) the loss of the dues paid by the departing members; (2) reduced NCAA distributions, including conference grants based on the number of schools in the conference and enhancements based on the number of championships sponsored by the conference; (3) reduced conference championship revenue, including ticket and merchandise sales; (4) increased travel expenses for the remaining members, who will in some cases be required to travel longer distances for away games; (5) the cost of replacing the departing members; and (6) reputational harm to the PBAC.

22. At the Executive Committee meeting on July 1, 2020, the Committee recommended that the exit fee be increased to more fully reflect the significant costs and expenses associated with the departure of a member school. Recognizing that the damages associated with the withdrawal of a member school could not be precisely estimated, the Executive Committee recommended that the conference adopt a flat exit fee reasonably approximating the anticipated losses. Specifically, the Executive Committee recommended that any member withdrawing from the conference on at least two years' notice be assessed a flat exit fee equal to that of the new member initiation fee (currently $120,000). The Executive Committee further recommended that any member

withdrawing on less than two years' notice (in violation of the withdrawal provision) be assessed an exit fee equal to twice that of the new member initiation fee, because it would leave the conference reduced in size for an additional academic year while the PBAC searched for a replacement.

First, Commissioner Brunk's affidavit sets forth elsewhere that he served as an ex-officio, non-voting member and recording secretary of the Executive Committee, that he was personally familiar with PBAC's business records, and that he had personal knowledge of the facts set forth in the affidavit. Accordingly, any challenge to detailed paragraphs within the affidavit on the basis that it is self-serving is unpersuasive, because the affidavit of an interested party based on personal knowledge of specific facts can be admissible in evidence and is sufficient to support or defeat summary judgment even though it serves the party's self-interest. See OCGA § 9-11-56 (e) (requiring supporting affidavits to be made on personal knowledge and to set forth such facts as would be admissible in evidence); *Keene v. Herstam*, 225 Ga. App. 115, 117 (1) (483 SE2d 335) (1997) ("self-serving does not equate with conclusory when the statements contained in an affidavit are supported, as here, by substantiating fact and circumstances").

Moreover, Young Harris contends that Commissioner Brunk's affidavit is inadmissible hearsay because it "did nothing more than attest to what others did or did not do" since Commissioner Brunk is a "non-voting, ex-officio member of the PBAC Executive Committee." We disagree. Commissioner Brunk testified at his deposition that he, indeed, *participated* in the meeting in his capacity as an ex officio member.

(b) Whether the trial court should have denied PBAC's summary judgment because this is a "doubtful case"

Finally, Young Harris contends that the trial court should have applied the principle of law that in cases of doubt, courts favor a construction of a contract which holds the stipulated sum to be a penalty, and limits the recovery to the amount of damages actually shown, rather than a liquidation of the damages. We disagree that this is a case of doubt. Here, as set forth in Division 3 (a), supra, the undisputed evidence shows no genuine issue of material fact that the exit fee met each part of the tripartite test for determining a valid and enforceable liquidated damages clause. Thus, the trial court did not need to favor a construction of the contract to hold the exit fee as a penalty. Cf. *Southeastern Land Fund, Inc. v. Real Estate World, Inc.*, 237 Ga. 227, 231-232 (227 SE2d 340) (1976) ("lingering ambiguity" inherent in provision that

established retention of two sets of earnest money, for $5,000 and the $45,000, each as "partial liquidated damages," without clearly providing for whether the two amounts represented the maximum and minimum that could be collected from the buyer's breach, rendered the provisions unenforceable); *Grayhawk Homes, Inc. v. Addison*, 355 Ga. App. 612, 615-616 (1) (845 SE2d 356) (2020) (classifying the case as one of doubt where liquidated damages within employment agreement had connection to damages flowing from breach of some, but not all, restrictive covenants within agreement and the evidence showed that the same liquidated damages provision was included in nearly every employee's agreement notwithstanding that the damages from breach of the non-compete provision would not be the same for each employee).[2]

*Judgment affirmed. Doyle, P. J., and Markle, J., concur.*

---

[2] PBAC has filed a motion seeking the imposition of the ten percent statutory sanction authorized by OCGA § 5-6-6. Because the record in this case does not clearly reflect that Young Harris pursued the appeal for delay only, we deny the motion. *Warnock v. Davis*, 267 Ga. 336, 336 (2) (478 SE2d 124) (1996).